UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JULIE A. GRAHAM, | : | CIVIL NO: 1:19-CV-01339 |
| | : | |
| Plaintiff, | : | (Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| ROBERT WILKIE, | : | |
| | : | |
| Defendant. | : | |

**<u>MEMORANDUM OPINION</u>**

## I.     Introduction.

Plaintiff, Julie Graham ("Graham"), filed a complaint against the defendant,

Robert Wilkie ("Wilkie") the former Secretary of the Department of Veterans Affairs,

claiming that the Lebanon County Veterans Affairs Medical Center ("VA")[1]

discriminated against her on the basis of her disability.   Because Graham fails to

rebut the VA's non-discriminatory reason for denying her backpay and benefits, we

will grant summary judgment in favor of the Secretary.

---

[1] When this complaint was filed, Wilkie was the Secretary of Department of Veterans Affairs.   Denis McDonough (the "Secretary") is now the Secretary of the Department of Veterans Affairs.   Accordingly, we recommend that McDonough be substituted for Wilkie as a defendant in this action. *See* Fed. R. Civ. P. 25(d) (providing that when a public officer sued in his or her official capacity ceases to hold office while the action is pending, "[t]he officer's successor is automatically substituted as a party.").

## II.    Background and Procedural History.

On August 1, 2019, Graham filed her pro se complaint against The Secretary. *Doc. 1*.   In her complaint, Graham alleges that, while working as a Licensed Practical Nurse ("LPN") at the VA, she began a sexual relationship with another employee (the "employee"). *Id*. at ¶ 10.   In December 2013, charges were filed against Graham based on her alleged failure to disclose her HIV status to the employee during their relationship. *Id*.   Specifically, Graham was charged with "two felonies, Aggravated assault and Sexual assault and two misdemeanors, Simple assault and Recklessly endangering another person." *Id*.   Per Graham, after the charges against her were published online, the VA "took positions adverse to plaintiff and at every opportunity the VA's decision was based on documented evidence of bias towards plaintiff's HIV status." *Id*. at ¶ 11.

Graham claims that, on January 8, 2014, the VA placed her on an authorized absence with pay pending her preliminary hearing. *Id*. at ¶ 12.   Ultimately, Graham decided to waive her right to a preliminary hearing. *Id*.   On March 26, 2014, the VA placed Graham on an indefinite suspension without pay. *Id*. at ¶ 13.   Per Graham, "the reason for the indefinite suspension was plaintiff's waiver of her right to have a preliminary hearing on the criminal charges filed against her." *Id*.   According to Graham, the VA found Graham's waiver of the preliminary hearing as reasonable

cause to believe she may have committed a criminal offense for which she could be imprisoned. *Id*.   Graham claims that the VA's decision was based on a bias toward her HIV status. *Id*.   Graham further alleges that the VA's stated reason for her indefinite suspension is "pretextual and contrived." *Id*. at ¶ 15.

Per Graham, on March 27, 2015, "both felony charges and one misdemeanor charge were withdrawn and the remaining misdemeanor charge, reckless endangerment, was addressed on March 30, 2015[,] when plaintiff entered an accelerated rehabilitative disposition program." *Id*. at ¶ 20.   Graham claims that, after she completed the accelerated rehabilitative disposition ("ARD") program, all charges were dismissed and expunged. *Id*.   On April 2, 2014, Graham's indefinite suspension ended, and she returned to work on April 20, 2015. *Id*. at ¶ 21.   Graham claims that the VA refused to give her "back pay, leave benefits, contributions to retirement, updated accuracy of her employment personal file and removal of reprimands in her file." *Id*.   Additionally, Graham alleges that she missed a step increase that she would have received had she never been suspended. *Id*.   Per Graham, the VA's denial of her back pay is based on discrimination against her because of her HIV status. *Id*. at ¶ 28.   For relief, Graham requests damages, an order expunging information and documents from her personal employee record, and attorney's fees and costs. *Id*. at 9.

3

On August 27, 2020, the parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned. *Doc. 23*. On October 4, 2021, the Secretary filed a motion for summary judgment (*doc. 37*) with a statement of material facts (*doc. 38*) and a brief in support of the motion for summary judgment. *Doc. 39*.   Graham then filed her answer to the Secretary's statement of material facts (*doc. 41*) and a brief in opposition (*doc. 42*) to the Secretary's motion for summary judgment.   On November 5, 2021, the Secretary filed a reply brief (*doc. 43*) to Graham's brief in opposition.

### III.    Summary Judgment Standard.

The Secretary moves for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F.Supp.2d 1086, 1091 (M.D. Pa. 2011) (quoting Fed. R. Civ. P. 56(a)).

4

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322.

Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 249 (1986).   There must be more than a scintilla of evidence supporting

the nonmoving party and more than some metaphysical doubt as to the material facts.

*Id.* at 252.   "Where the record taken as a whole could not lead a rational trier of fact

to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes

over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.   A

dispute about a material fact is genuine only if there is a sufficient evidentiary basis

that would allow a reasonable fact finder to return a verdict for the non-moving party.

*Id.* at 248–49.

When "faced with a summary judgment motion, the court must view the facts

'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l*

*Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris,* 550 U.S.

372, 380 (2007)).   At the summary judgment stage, the judge's function is not to

weigh the evidence or to determine the truth of the matter; rather it is to determine

whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249.   The proper

inquiry of the court "is the threshold inquiry of determining whether there is the need

for a trial—whether, in other words, there are any genuine factual issues that properly

can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.   "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex,* 477 U.S. at 323).   "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

## IV.   Material Facts.

We note from the outset that Graham's answer to the Secretary's statement of material facts does not entirely comply with Local Rule 56.1 despite our orders informing her of the relevant standards. *Docs. 3*, *40*.   Local Rule 56.1 requires a

party moving for summary judgment to file "a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. Pa. L.R. 56.1.   The Rule, in turn, requires the non-moving party to file "a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required [by the moving party], as to which it is contended that there exists a genuine issue to be tried." *Id.*   The "[s]tatements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements," and "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." *Id.*

In her answer to the Secretary's statement of material facts, Graham only responds to paragraphs 4, 5, and 10. *See doc. 41.*   Accordingly, we will deem all other statements in the Secretary's statement of material facts as admitted. *See Georgiadis v. Cumberland County*, No. 1:11-cv-00964, 2015 WL 1445408, at *1 (M.D. Pa. Mar. 30, 2015) ("When a non-moving [pro se] party fails to file a separate statement of material facts controverting the statements filed by the moving party, under Local Rule 56.1, we will deem admitted all material facts set forth in the moving party's statement of material facts."); *see also Smith v. Addy*, 343 F. App'x

8

806, 808 (3d Cir. 2009) (same).   Before we recite the Secretary's admitted material

facts, we will first discuss the three statements Graham attempts to dispute.

### A. Paragraphs 4, 5, and 10.

In paragraph 4, the Secretary asserts that "[d]uring an interview with a

Pennsylvania State Trooper, Graham admitted to having unprotected sexual

intercourse with the fellow Lebanon VA employee on at least two occasions." *Doc.*

*38* at ¶ 4 (citing *Doc. 38-1* at 14).   In paragraph 5, the Secretary asserts that "Graham

was aware she was HIV positive when she had unprotected sexual intercourse with

the fellow Lebanon VA employee on at least two occasions." *Id*. at ¶ 5.   Graham

responds to these statements by asserting that she never disclosed her HIV status to

the Pennsylvania State Trooper. *Doc. 41* at 1-2 (citing *41-1* at ¶ 3).   Graham also

states that the Pennsylvania State Trooper made a statement during the interview that

Graham "failed to affirmatively disclose to [the employee] and that the failure was an

act which [r]ecklessly [e]ndangered [a]nother." *Doc. 41* at 1-2 (citing *41-1* at ¶¶ 3-4).

Graham then explains the Pennsylvania State Trooper told her that he obtained a

search warrant for her medical records at Hershey Medical Center and that he knew

she had been HIV positive since September 2011. *Doc. 41* at 2.

The Secretary argues that Graham does not dispute either paragraph 4 or

paragraph 5. *Doc. 43* at 5.   We agree that Graham does not dispute that she had unprotected sexual intercourse with the employee on at least two occasions; however, we find that Graham does dispute that she admitted it during her interview with the Pennsylvania State Trooper.   As it relates to paragraph 5, we agree that Graham does not dispute that she was aware she was HIV positive when she had unprotected sex with the employee on at least two occasions.   Instead, she only disputes that she dd disclosed this to the Pennsylvania State Trooper.   Accordingly, we will deem paragraphs 4 and 5 of The Secretary's statement of material facts as admitted, insofar as Graham does not dispute that she had unprotected sex with the employee on at least two occasions and that she was aware that she was HIV positive during this period.

In paragraph 10, the Secretary asserts that Graham's supervisor, Margaret Wilson ("Wilson"), stated that:

> In light of the seriousness of this situation involving [Graham's] alleged assault and reckless endangerment of a fellow employee, and on the basis that the alleged criminal acts are incompatible with [her] official duties and responsibilities, it is not in the best interest of the Department of Veterans Affairs to retain [Graham] in a duty status during the law enforcement investigation and related judicial proceedings.

*Doc. 38* at ¶ 10 (citing *38-1* at 10).

In her answer to the Secretary's statement of material facts, Graham does not

10

dispute that Wilson made this statement; however, Graham argues that Wilson's

statement is not true from a medical and criminal perspective. *Doc. 41* at 2-3.   We

agree with the Secretary that Graham does not dispute that Wilson made this

statement; therefore, paragraph 10 of The Secretary's statement of material facts is

deemed admitted.

### B.  Undisputed material facts.[2]

Graham began her employment at the VA as an LPN on March 11, 2013. *Doc.*

*38* at ¶ 1.   As of October 4, 2021, Graham is still employed as an LPN at the VA. *Id.*

at ¶ 2.   In December 2013, Graham was charged with two felonies, Aggravated

Assault and Sexual Assault. *Id.* at ¶ 3.   Additionally, Graham was charged with two

misdemeanors, Simple Assault and Recklessly Endangering Another Person. *Id.*

These charges stemmed from Graham's unprotected sex with the employee, where

she did not disclose her HIV status to the employee. *Id.*

Graham admits that she had unprotected sex with the employee on at least two

---

[2]  We note that both parties, throughout their respective briefs, frequently refer
to various VA and government procedures, policies, and committees without
providing an explanation to the court as to how these entities operate or relate to each
other.   Additionally, the sequence of events is, at times, unclear and difficult for the
court to follow.   Yet, except where previously noted and discussed, Graham does not
dispute or disagree with the Secretary's timeline of events or characterization of said
events.   Accordingly, we will assume that the parties thoroughly understand the
referenced procedures, so we will only annotate or provide context when necessary.

occasions and that she was aware of her HIV status during those occasions. *Id*. at

¶¶ 4-5.   On January 8, 2014, the VA placed Graham on an authorized absence status,

with pay and without any charge of leave, until an administrative investigation

regarding the criminal charges concluded. *Id*. at ¶¶ 6-7.   On February 27, 2014,

Graham waived her right to a preliminary hearing on the criminal charges filed

against her. *Id*. at ¶ 8.

On March 10, 2014, Wilson informed Graham that the VA intended to

indefinitely suspend her, informing her that:

> In light of the seriousness of this situation involving [Graham's]
> alleged assault and reckless endangerment of a fellow employee,
> and on the basis that the alleged criminal acts are incompatible
> with [her] official duties and responsibilities, it is not in the best
> interest of the Department of Veterans Affairs to retain [Graham]
> in a duty status during the law enforcement investigation and
> related judicial proceedings.

*Id*. at ¶¶ 9-10.

Robert Callahan ("Callahan"), the director of the VA, informed Graham that

"she would be indefinitely suspended in a non-duty status without pay effective

March 31, 2014, based upon the crime provision." *Id*. at ¶ 11.[3]   Graham was

_____

[3] Throughout their briefs, the parties refer to the crime provision, which is a
provision of the Civil Service Reform Act of 1978 and "govern[s] actions by the
government against its employees.   Subchapter II of Chapter 75 of Title 5 of the U.S.
Code 'applies to' five types of adverse action, including removals, reductions in

12

informed that she would remain suspended until the law enforcement investigation and any related judicial proceedings concluded. *Id*. at ¶ 12.   Callahan informed Graham that her suspension was premised upon her arrest warrant and that, by waiving her right to a preliminary hearing, she conceded that the Commonwealth of Pennsylvania "possessed sufficient evidence to establish a *prima facie* case of [her] guilt in connection with the charges brought against [her]." *Id*. at ¶¶ 13-14. Additionally, Callahan conveyed to Graham that there was a reasonable basis that "she committed one or more criminal offense for which the penalty of imprisonment may be imposed." *Id*. at ¶ 15.

Callahan then instructed Graham to contact Human Resources no later than 10 days after the completion of the law enforcement investigation and any related judicial proceedings *Id*. at ¶ 16.   Additionally, Callahan advised Graham of her

---

grade or pay and 'a suspension for more than 14 days." *Perez v. DOJ*, 480 F.3d 1309, 1311 (Fed. Cir. 2007) (quoting 5 U.S.C. § 7512(2)).

5 U.S.C. § 7513 (a) states that, "[u]nder regulations prescribed by the Office of Personnel Management, an agency may take an action covered by this subchapter against an employee only for such cause as will promote the efficiency of the service. 5 U.S.C. § 7513 (a).

5 U.S.C. § 7513 (b)(1), which is the criminal provision to which the Secretary refers, states that "[a]n employee against whom an action is proposed is entitled to at least 30 days' advance written notice, unless there is reasonable cause to believe the employee has committed a crime for which a sentence of imprisonment may be imposed, stating the specific reasons for the proposed action." 5 U.S.C. § 7513 (b)(1).

options should she choose to appeal his decision to indefinitely suspend her,

including appealing through the Equal Employment Opportunity Commission

("EEOC"), the Merit Systems Protection Board ("MSPB"), the Office of Special

Counsel, or a negotiated grievance procedure.[4]  *Id*. at ¶ 17.   Callahan also stated that

---

[4] On March 26, 2014, Callahan sent a letter to Graham, explaining the VA's decision to indefinitely suspend her and what appeal options were available to her. Specifically, Callahan stated:

> You are entitled to:
> a)  Appeal this action to the Merit Systems Protection Board (MSPB) or
> b)  Seek corrective action before the U.S. Office of Special Counsel (OSC) or
> c)  File a grievance under the negotiated grievance procedure or
> d)  A discrimination complaint with the Office or Resolution Management

> You shall be deemed to have exercised your option to appeal the adverse action at such time as you timely initiate action to appeal to MSPB or OSC, or timely file a grievance in writing under the negotiated grievance procedure, or a discrimination complaint.   If your appeal includes an allegation that the facility engaged in a prohibited personnel action in retaliation for protected whistleblowing, you may elect to file an appeal to MSPB, OSC, or a negotiated grievance and your election is based on which election you make first.

*Doc. 38-1* at 14.

Additionally, we note that "[t]he Merit Systems Protection Board … is an independent, quasi-judicial federal administrative agency that was established by the Civil Service Reform Act of 1978 (CSRA), 5 U.S.C.S. § 1101 et seq., to review civil service decisions. 5 U.S.C.S. § 7701." *Jones v. United States DOJ*, 111 F. Supp. 3d 25, 31 (D.D.C. 2015).

he considered the 12 *Douglas* factors[5] when determining that Graham should be

---

[5] In *Douglas v. VA*, 5 M.S.P.R. 280, the Merit Systems Protection Board outlined the following 12 factors that must be considered in determining the appropriate penalty for employee misconduct:

1. The nature and seriousness of the offense and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

2. The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

3. The employee's past disciplinary record;

4. The employee's past work record, including length of service, performance on the job, ability to get along with other employees, and dependability;

5. The effect of the offense on employee's ability to perform at a satisfactory level and its effect upon the supervisor's confidence in the employee's ability to perform assigned duties;

6. Consistency of penalty with those imposed on other employees for the same or similar offenses;

7. Consistency of penalty with the applicable agency table of penalties;

8. The notoriety of offense or the impact upon the reputation of the agency;

9. The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;

10. Potential for employee's rehabilitation;

11. Mitigating circumstances surrounding the offense such as unusual job

15

indefinitely suspended. *Id*. at ¶ 18.   Graham admitted that she received the indefinite

suspension letter and that if she were convicted of the pending criminal charges, she

could have been incarcerated. *Id*. at ¶ 19.

On April 21, 2014, the American Federation of Government Employees

("AFGE") filed a grievance on Graham's behalf, requesting that she only be issued a

25-day suspension. *Id*. at ¶ 20.   Graham then sent a letter to Callahan, requesting that

she be allowed to return to work and stating that the crime provision was not

uniformly applied because an employee who committed a DUI continued to work

prior to conviction. *Id*. at ¶¶ 21-22.   After a grievance meeting with Graham, her

union representative, the Assistant Chief of Human Resources, and Callahan,

Graham's indefinite suspension was upheld because Callahan determined that there

was reasonable cause to believe that Graham could be imprisoned. *Id*. at ¶¶ 23-24.

Callahan informed the AFGE and Graham that case law supported the notion that the

waiver of a preliminary hearing satisfied the reasonable cause standard and that the

crime provision allowed for management to defer final judgment on the employee's

---

       tensions, personality problems, mental impairment, harassment, or bad
       faith, malice or provocation on the part of others involved in the matter;

12. The adequacy and effectiveness of alternative sanctions to deter such
       conduct in the future by the employee or others.

*Douglas v. VA*, 5 M.S.P.R. 280, 305-306 (1981).

behavior until all judicial proceedings were concluded. *Id*. at ¶¶ 28, 30.   Callahan

stated that he considered Graham's example of the employee who was charged with a

DUI; however, he concluded that the circumstances were not the same as Graham's

situation. *Id*. at ¶¶ 31-32.   Ultimately, Callahan affirmed Graham's indefinite

suspension and noted that his decision "constituted the completion of … Step 3 of the

Negotiated Grievance procedure." *Id*. at ¶ 34.[6]

On March 27, 2015, the two felony charges and one misdemeanor charge for

Simple Assault were withdrawn, and on March 30, 2015, Graham entered into ARD

for the misdemeanor charge of Recklessly Endangering Another Person. *Id*. at ¶¶ 35-

36.   Graham completed ARD on June 30, 2015. *Id*. at ¶ 37.   On April 16, 2015,

Wilson directed Graham to return to work, which she did on April 20, 2015. *Id*. at

---

[6] In Callahan's letter to Graham, he informed her that "[t]his letter constitutes the completion of the Step 3 of the Negotiated Grievance procedure.   You will have thirty (30) calendar days from the date of the issuance of this decision to invoke arbitration by notifying management in writing of your intent in accordance with Article 44-Arbitration of the DVA-AFGE Master Agreement." *Doc. 38-1* at 28. Regarding Step 4, Article 44-Arbitration of the DVA-AFGE Master Agreement states "[i]f the grievance is not satisfactorily resolved in Step 3, the grievance may be referred to arbitration as provided in Article 44 - Arbitration.   Only the Union or the Department can refer a grievance to arbitration." *Master Agreement between the Department of Veterans Affairs and the American Federation of Government Employees 2011*, at 231, https://www.va.gov/files/2021-10/Master_Agreement_between_DVA_and_AFGE.pdf.   Nothing in the record indicates, nor does Graham claim that she proceeded to Step 4 of the Negotiated Grievance procedure.

¶¶ 38-39.   On May 25, 2015, via a letter, Graham requested that Callahan "pay her salary, accrual of leave, benefits, contributions to retirement, and step increases from March 31, 2014, until April 20, 2015, the time period she was suspended from the Lebanon VA while her criminal charges were being resolved." *Id*. at ¶ 40.   On June 18, 2015, Callahan responded to Graham's request via a letter informing her that her indefinite suspension was upheld because there was reasonable cause to believe she could have been imprisoned for the charged crimes. *Id*. at ¶ 41.   Callahan noted that because there was no error in deciding to indefinitely suspend her, Graham was not entitled to any back pay. *Id*. at ¶ 42.

Graham appealed Callahan's decision to the MSPB, and on November 19, 2015, the MSPB opined that because Graham challenged her suspension through the negotiated grievance procedure rather than an MSPB appeal, the MSPB lacked jurisdiction over any claims regarding the suspension. *Id*. at ¶¶ 44-45.   Additionally, the MSPB noted that "[a]ny such claim would be untimely in any event." *Id*. at ¶ 46.[7] The MSPB also found that Graham had no cognizable claim regarding her

---

[7] The Secretary cites to the MSPB's decision, which concluded that it lacked jurisdiction to consider Graham's underlying suspension because "it is undisputed that the appellant opted to challenge the suspension through the negotiated grievance procedure rather than a Board appeal … [t]his election of remedies deprives the Board of any jurisdiction over any claims regarding the original suspension." *Doc. 38-1* at 45 (internal citations omitted).

reinstatement because "she was only entitled to reinstatement within a reasonable amount of time, which Graham did not challenge." *Id*. at ¶ 47.   Because the MSPB determined it could not consider the suspension or reinstatement, it lacked jurisdiction over Graham's request for back pay. *Id*. at ¶ 48.   Finally, because the MSPB found that the Federal Circuit has held that a lawfully suspended employee is not entitled to back pay even after they are acquitted, they dismissed Graham's appeal for lack of jurisdiction. *Id*. at ¶¶ 49-50.

On September 3, 2015, Graham initiated EEOC counseling, claiming that Callahan discriminated against her based on her disability when he denied her request to receive retroactive pay and benefits. *Id*. at ¶ 53.   On December 9, 2015, Graham filed a complaint with the EEOC. *Id* at ¶ 54.   The VA dismissed Graham's EEO complaint[8], and Graham timely appealed the EEOC dismissal with the EEOC Office of Federal Operations ("OFO") on March 17, 2016. *Id*. at ¶¶ 55-56.   On February 2, 2017, the EEOC OFO "remanded to the agency the back pay with benefits and interest claim and directing it to investigate it because the agency had discretion on whether to award [Graham] back pay with benefits after she returned to work." *Id*. at

---

[8]  The Secretary cites to a May 7, 2019, OFO letter to Graham, which states "[o]n February 19, 2016, the Agency dismissed Complainant's complaint." *Doc. 38-1* at 95.   It is unclear based on the wording; however, it appears as though the Agency refers to the Lebanon VA.

¶ 57.   On October 20, 2017, the VA issued a final decision and denied Graham's claim that she was discriminated against due to her disability. *Id*. at ¶ 58.   Graham then appealed the VA's decision to the EEOC OFO, which affirmed the VA's decision, finding the VA's decision was "not so unreasonable as to constitute evidence of discriminatory animus." *Id*. at ¶ 59.

Graham later testified[9] that, to her knowledge, Callahan had not failed to "comply with any VA policies and procedures in not providing her with back pay and benefits while she was indefinitely suspended." *Id*. at ¶ 62.   When Graham later argued that Callahan did not make the right decision, Callahan declared:

> The time she spent on indefinite suspension (in non-pay status) was while her criminal charges were pending. I found no error in imposing the indefinite suspension and thus could not justify granting a request for back pay. Further, during this time, Ms. Graham was performing no work related to her position at the Department of Veterans Affairs. Restoring back pay and benefits for the time period when criminal charges were pending and no work was completed is not a responsible use of taxpayer resources and actually undermines public confidence in government.

*Id*. at ¶ 64.[10]

––––––––––––––––––––

[9]  The Secretary cites to a transcript, where Graham provided telephonic testimony to Beverly Stokes, an investigator for the Department of Veterans Affairs Office of Resolution Management. *Doc. 38-1* at 76-77.

[10]  The Secretary cites to Callahan's written affidavit that he provided in the matter of Graham's EEO discrimination complaint.

As to why Graham believed the VA discriminated against her based on her

HIV status, Graham stated[11]:

> Dennis Donahoe, Robert Callahan, Margaret Wilson, Robert
> Lambert and Mary Swirsky were all involved in preparation of the
> internal "Douglas factors" memo in response to my request for
> back pay and related benefits during the period of indefinite
> suspension. In that memo, Lebanon VA had never invoked the
> crime provision indefinite suspension provision ever before my
> case. In that memo, the VA said "Ms. Graham should have known
> that ... having unprotected sex with someone is wrong." Also,
> "Ms. Graham's apparent deliberate deception of a fellow
> employee (i.e. his potential exposure to HIV) is of such
> seriousness that it calls into question her ability to be truthful in
> other less serious matters, but particularly those concerning patient
> care." And, "she failed to acknowledge and accept personal
> responsibility, nor did she express regret for her actions." The
> memo was dated March 26, 2014; my attorneys received a copy of
> the memo August 7, 2015.
> The VA initially answered my claim for unemployment
> compensation with the defense that I had committed willful
> misconduct in the workplace. It was obvious, under all of the
> circumstances, that the VA equated "willful misconduct in the
> workplace" with my infection with the HIV virus, and with my
> personal behavior outside work.

*Id*. at ¶ 65.

In response to Graham's contention that the denial of back pay and benefits

was motivated by disability discrimination, Callahan referred to the *Douglas* Factors

---

[11] The Secretary cites to Graham's answer to the Secretary's first set of
interrogatories and her telephonic testimony. *Doc 38-1* at 79, 80, 139, 140.

Memo[12], and stated that:

_____

[12] The fifth *Douglas* factor: "Ms. Graham's apparent deliberate deception of a fellow employee (i.e. his potential exposure to HIV) is of such seriousness that it calls into question her ability to be truthful in other less serious matters, but particularly those concerning patient care. This factor does not support mitigation of the proposed penalty." *Doc. 38-1* at 18

The sixth *Douglas* factor: "There are no similar offense by employees. The Lebanon VA Medical Center has not imposed the crime provision-indefinite suspension in the past. This factor is considered neutral; it neither supports mitigation nor sustainment of the proposed penalty." *Id.*

The eighth *Douglas* factor: "On January 4, 2014, The Patriot News ran a news story on its Online Website entitled 'Susquehanna Township Woman Arrested for Assault after Lying About HIV Status,' which identified Ms. Graham by name. In the Online Comments Section concerning this story, it was mentioned that Ms. Graham was an employee of the Lebanon VA Hospital. The number of comments and days of the story were significant and reflected poorly upon the quality of medical center staff and the reputation of the agency. This factor does not support mitigation of the proposed penalty." *Id.* at 19

The ninth *Douglas* factor: "Ms. Graham had unprotected sex and lied to the victim about having any sexually transmitted diseases. Ms. Graham should know that denying that she was HIV Positive and having unprotected sex with someone is wrong. This factor does not support mitigation of the proposed penalty." *Id.*

The tenth *Douglas* factor: "The potential for rehabilitation is poor. Ms. Graham provided both an oral and written response to the proposed indefinite suspension. She failed to acknowledge and accept personal responsibility, nor did she express regret for her actions. Ms. Graham's actions endangered a fellow employee. Moreover[,] her verbal responses emphasized her desire and attempts to have the charges reduced through bargaining with the district attorney as a means to reduce any penalties. In summary, she failed to acknowledge personal responsibility for her actions and her concerns were directed toward her financial impact, and she failed to recognize the lack of trust and damage done to the employer-employee relationship. This factor does not support mitigation of the proposed penalty." *Id.*

22

> The quotes provided above are factually accurate and fully
> describe the situation in each of the Douglas Factors. That being
> stated, these facts are not discriminatory in nature against
> someone with a disability. The denial of back pay and benefits is
> related to the period of time when her criminal charges were
> pending. I found no error in imposing the indefinite suspension
> and thus could not justify granting a request for back pay. Further,
> during this time, Ms. Graham was performing no work related to
> her position at the Department of Veterans Affairs. Restoring back
> pay and benefits for the time period when criminal charges were
> pending[,] and no work was completed is not a fiducially
> responsible use of taxpayer resources.

*Id*. at ¶ 66.

After the VA invoked the crime provision to indefinitely suspend Graham, it

again invoked the crime provision when it decided to indefinitely suspend another

VA employee. *Id*. at ¶ 67.

## V.     Discussion.

Here, because Graham claims that the VA discriminated against her based on

her disability, her claim is brought under the American with Disabilities Act

("ADA") and the Rehabilitation Act ("RA").   Thus, before we begin our discussion

of Graham's claims, we will first outline some of the applicable standards.

"Congress enacted the ADA in 1990 as a 'clear and comprehensive national mandate'

designed to eliminate discrimination against individuals with physical and mental

disabilities across the United States." *McGann v. Cinemark USA, Inc.*, 873 F.3d 218,

221 (3d Cir. 2017) (quoting 42 U.S.C.A. § 12101(b)(1)).   Title II of the ADA

provides that "no qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any

such entity." 42 U.S.C. § 12132 (1).   Similarly, Section 504 of the RA provides that

"[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her

or his disability, be excluded from the participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal financial

assistance." 29 U.S.C. § 794(a).   "With limited exceptions, the same legal principles

govern ADA and RA claims." *C.G. v. Pennsylvania Dep't of Educ.*, 734 F.3d 229,

235 (3d Cir. 2013) (footnote omitted).[13]   Thus, we analyze the ADA and RA claims

together under the rubric of the ADA.

The ADA prohibits discrimination "against a qualified individual on the basis

of disability in regard to job application procedures, the hiring, advancement, or

discharge of employees, employee compensation, job training, and other terms,

---

[13] "Causation standards are different under the ADA and RA—under the RA, the disability must be the sole cause of the discriminatory action, while the ADA only requires but-for causation." *Furgess v. Pennsylvania Dep't of Corr.*, 933 F.3d 285, 291 n.25 (3d Cir. 2019).   Another "difference between the ADA and RA is that to bring a claim under the RA, a plaintiff must show that the allegedly discriminating entity receives federal funding." *C.G.*, 734 F.3d at 235 n.10.

conditions, and privileges of employment." 42 U.S.C. § 12112(a).   Where, as here, the plaintiff contends that the defendant's stated reason for the adverse action is a pretext for discrimination, the *McDonnell Douglas*[14] burden-shifting analysis applies to an ADA discrimination claim.[15]

That analysis has three stages:

First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.*   Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999) (quoting *McDonnell Douglas*, 411 U.S. at 802).   "Although the burden of production of evidence shifts back and forth, the plaintiff has the ultimate burden of persuasion

---

[14] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973).

[15]  The same analysis as under the ADA generally applies to a PHRA claim and to an RA claim. *See Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012) ("[W]e note that the Rehab Act, ADA, and PHRA ("the Acts") are all to be interpreted consistently, and that all have the same standard for determination of liability.").   Accordingly, we will only discuss Graham's ADA claim because our analysis of that claim applies as well to the PHRA and RA claims.

25

at all times." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015).

### A. *Prima facie* case.

The plaintiff's burden at the *prima facie* stage is not onerous. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253 (1981).   The purpose of the *prima facie* case is to eliminate the most common nondiscriminatory reasons for the defendant's actions. *Id.* at 253-54.   Establishment of the *prima facie* case creates a presumption of unlawful discrimination. *Id.* at 254.   The elements of a *prima facie* case raise an inference of discrimination because the law presumes that the defendant's actions comprising the *prima facie* case, if not otherwise explained, are more likely than not based on the consideration of impermissible factors. *Id.* at 254.

There is no rigid formulation of a *prima facie* case under *McDonnell Douglas*. *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 938 (3d Cir. 1997). The elements of a *prima facie* case vary depending on the type of claim and the factual situation. *Id.*   Courts have set forth the elements of a *prima facie* ADA claim in various ways.   Most commonly, Courts state that "[i]n order to establish a prima facie case of disparate treatment under the ADA, a plaintiff must show '(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable

26

accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.'" *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000)(quoting *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir.1998)); *but see Latta v. U.S. Steel-Edgar Thompson Plant*, No. 2:11-CV-1622, 2013 WL 6252844, at *4 (W.D. Pa. Dec. 4, 2013)("To establish a prima facie case of discrimination, Plaintiff must show that (1) he is a member of a protected category; (2) he applied for and was qualified for a job for which the employer was seeking applicants; (3) despite his qualifications, he was rejected; and (4) after his rejection, the position remained open and the employer continued to seek applicants.); *Proudfoot v. Arnold Logistics, LLC*, No. 1:13-CV-1650, 2014 WL 5823075, at *5 (M.D. Pa. Nov. 10, 2014) ("First, a plaintiff must make out a *prima facie* case of discrimination by showing that: (1) he or she was disabled within the meaning of the ADA; (2) he or she was qualified for the position which he or she held; (3) he or she suffered an adverse employment action that could give rise to an inference of willful discrimination.").

Here, the Secretary does not dispute that Graham is disabled or that she was qualified to perform her job at the VA. *Doc. 39* at 7.   Instead, the Secretary's only contention is that Graham has not demonstrated that she was denied back pay and benefits due to her disability, and thus, she fails to establish a *prima facie* disability

discrimination claim against the Secretary. *Id.*   The Secretary contends that Graham cannot establish the third element of a *prima facie* case, *i.e.,* that she suffered an adverse employment action based upon her disability.   The parties cite the same evidence and make the same arguments with respect to the *prima facie* case as they do with respect to pretext, a later step in the burden-shifting analysis.   Because there is some uncertainty about whether a plaintiff needs to establish causation as part of the *prima facie* case, *see Showers v. Endoscopy Ctr. of Cent. Pennsylvania, LLC*, No. 1:13-CV-1146, 2014 WL 5810313, at *13 n.19 (M.D. Pa. Nov. 7, 2014)("The court acknowledges the existence of authority that suggests that a plaintiff need not establish causation as part of her *prima facie* case"), and because, as discussed later, we conclude that Graham has failed to present evidence to show that the VA's reason for denying her back pay and benefits was pretext for discrimination, we will assume for the sake of argument that Graham can establish a *prima facie* case.   And so, we proceed to the next stage of the *McDonnell Douglas* analysis.

### B. Legitimate nondiscriminatory reason.

Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment decision. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

An employer satisfies its burden of production by introducing evidence that would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. *Id*.   "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id*.

Here, the VA asserts that they denied Graham's request for back pay and benefits because she was suspended without pay while her criminal charges were being resolved. *Doc. 39* at 8.   This is a legitimate, nondiscriminatory reason for denying her back pay and benefits.

## C. Pretext.

Once the defendant meets its relatively light burden by articulating a legitimate reason for its action, the burden of production rebounds to the plaintiff.   To defeat summary judgment the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a determinative cause of the employer's action. *Daniels v. School Dist. of Phila.,* 776 F.3d 181, 198-99 (3d Cir. 2015).   To avoid summary

judgment, "the plaintiff's evidence rebutting the employer's proffered legitimate

reasons must allow a fact finder reasonably to infer that *each* of the employer's

proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise

did not actually motivate the employment action (that is, the proffered reason is a

pretext)." *Fuentes*, 32 F.3d at 764 (citations omitted).   "To discredit the employer's

proffered reason, the plaintiff cannot simply show that the employer's decision was

wrong or mistaken, since the factual dispute at issue is whether a discriminatory

animus motivated the employer, not whether the employer is 'wise, shrewd, prudent,

or competent.'" *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 331 (3d Cir.

1995)(quoting *Fuentes*, 32 F.3d at 765).   Rather, the plaintiff must demonstrate

"such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions"

in the employer's proffered reasons that a reasonable fact finder could rationally find

the proffered reasons unworthy of credence and infer that the employer did not act for

those asserted reasons. *Fuentes*, 32 F.3d at 765.

The Secretary contends that Graham has not shown that the denial to award her

back pay and benefits was a pretext for disability discrimination.   Specifically, the

Secretary argues that Graham, in her brief in opposition, only attempts to argue that

the decision to indefinitely suspend her was based on disability discrimination by

attacking Callahan's application of the *Douglas* factors.   And because it is

undisputed that Graham failed to exhaust her administrative remedies as it relates to challenging her indefinite suspension, *see doc. 38* at ¶ 45, and Graham does not attempt to argue otherwise; we agree with the Secretary that Graham cannot challenge the validity of her indefinite suspension here. *See Wiemers v. Merit Sys. Prot. Bd.*, 792 F.2d 1113, 1116 (Fed. Cir. 1986) (finding that the "reversal of the petitioner's conviction did not entitle him to back pay for any part of the period of suspension"); *see also Holleman v. Merit Sys. Prot. Bd.*, 629 Fed. App'x. 942, 948 (Fed. Cir. 2015) ("Holleman did not appeal his indefinite suspension and did not argue that it was an unjustified or unwarranted action in the first instance. Where, as here, the agency had reasonable cause to indefinitely suspend an employee, that employee is not entitled to back pay for the period of the suspension.").

Graham's arguments do not suggest, let alone demonstrate, that the VA's reason to indefinitely suspend her and to deny her back pay and benefits was a pretext.   For the sake of completeness, however, we will discuss each of Graham's arguments.

In her brief in opposition to the motion for summary judgment, Graham argues that Callahan demonstrated an "incomprehension and misunderstanding of fundamental principles of criminal law in Pennsylvania, and … [a] lack of even basic knowledge about modern HIV treatment and how this modern treatment changed

ideas and attitudes about non-disclosure, exposure, and transmission." *Doc. 42* at 3-4.
Graham contends that Callahan erred when he equated a waiving of a preliminary
hearing to a guilty plea. *Id.* at 4.   The Secretary argues that Callahan did not decide
to indefinitely suspend solely because she waived her right to a preliminary hearing,
but also based upon the warrant issued for her arrest, and that she was charged with
crimes for which she could be imprisoned. *Doc. 43* at 11 n.7.   With these factors
combined, the Secretary argues that there was reasonable cause to invoke the crime
provision to indefinitely suspend Graham. *Id.* at 11.   Moreover, the Secretary notes
that Graham alleges that Callahan focused on Graham's guilt, not her disability. *Id.* at
12.

     We agree with the Secretary that Graham's argument that Callahan's alleged
misunderstanding of Pennsylvania criminal law does not demonstrate that the VA's
stated reason for denying her back pay and benefits was a pretext to discriminate
against her based on her disability.   Here, Graham merely argues that Callahan was
mistaken in how he considered her waiver of a preliminary hearing; however, that is
insufficient to demonstrate the requisite discriminatory animus. *See Brewer*, 72 F.3d
at 331 (quoting *Fuentes*, 32 F.3d at 765) ("To discredit the employer's proffered
reason, the plaintiff cannot simply show that the employer's decision was wrong or
mistaken, since the factual dispute at issue is whether a discriminatory animus

motivated the employer, not whether the employer is 'wise, shrewd, prudent, or competent.'").   Indeed, for this exact reason, Graham's argument regarding Callahan's lack of knowledge of modern HIV treatment is equally unavailing and fails to demonstrate discrimination based upon her disability.

### i. Fifth *Douglas* factor.

Graham argues that Callahan's analysis of factor five, the effect of the offense on an employee's ability to perform at a satisfactory level and its effect upon the supervisor's confidence in the employee's ability to perform assigned duties, demonstrates that he discriminated against her based on her disability. *Doc. 42* at 8. Graham contends that one instance of failing to disclose her HIV status to a sexual partner does not impact her ability to perform her duties. *Id*.   Additionally, Graham argues that "it is more likely than not that Callahan's loss of confidence in Graham's ability to perform assigned duties arose because he learned that she was a [person living with HIV]." *Id*.   Graham further claims that the VA had no issue in restoring her to her previous position once the charges were dropped, and that this supports the notion that Callahan discriminated against her based upon her disability. *Id*. at 8-9.

The Secretary responds by noting that Graham has failed to produce evidence that supports her belief that Callahan's stated reasons were a pretext. *Doc. 43* at 15

(citing *Jones v. School Dist. of Phila.*, 403, 412-14 (3d Cir. 1999)).   We agree with the Secretary that Graham fails to produce evidence that Callahan's analysis of factor five was based on discriminatory animus.   It appears as though Graham is arguing that Callahan erred in determining that her failure to disclose her HIV status to a sexual partner impacted her ability to perform her duties at a satisfactory level. Again, it is insufficient for Graham to assert that Callahan was mistaken in his decision. *See Brewer*, 72 F.3d at 331.   Nor do we find Callahan's decision to contain "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that a reasonable fact finder could rationally find the proffered reasons unworthy of credence and infer that the employer did not act for those asserted reasons. *Fuentes*, 32 F.3d at 765.

Additionally, we find Graham's argument that the VA's decision to eventually restore her to her previous position is evidence that Callahan discriminated against her on the basis of her disability to be meritless.   Indeed, we find it entirely consistent that Graham was indefinitely suspended based on the charges against her, and that she was later restored to her position once those charges were dropped. Accordingly, we find that Graham, as it relates to the fifth *Douglas* factor, fails to demonstrate that the VA discriminated against her based upon her disability.

### ii. Sixth *Douglas* factor.

Graham argues that factor six, the consistently of penalty with those imposed on other employees for the same or similar offenses, should not have been considered neutral and should have been considered supportive of mitigation of Graham's penalty. *Doc*. 42 at 6-7.   Specifically, Graham contends that, prior to her charges, two other employees were charged with crimes, one of which was a DUI, and they received no discipline. *Id*.   Graham argues that this leads to an inference that she was discriminated against because of her disability. *Id*. at 7.   The Secretary contends that Graham offers no evidence to support her suspicion of discriminatory animus, and thus, fails to demonstrate a pretext for discrimination. *Doc. 43* at 16 (citing *Jones*, 403 at 412-14).   Additionally, the Secretary argues that Graham offers no evidence that the other employees were charged with the same or similar offenses. *Doc. 43* at 16.

We agree with the Secretary that Graham has not provided any evidence of other employees, who were charged with the same or similar offenses, and did not receive an indefinite suspension.   Indeed, "[t]o establish disparate penalties, the employee must show 'that the charges and the circumstances surrounding the charged behavior are substantially similar,' which includes 'proof that the proffered comparator was in the same work unit, with the same supervisor, and was subjected

to the same standards governing discipline.'" *Miskill v. SSA*, 863 F.3d 1379, 1384 (Fed. Cir. 2017) (quoting *Lewis v. Dep't of Veterans Affairs*, 113 M.S.P.R. 657, 660 (2010)).   Here, Graham has provided no evidence that the two VA employees were charged with similar or the same offenses.   In fact, Graham notes that one of the employees was charged with Driving Under the Influence, as opposed to felony assault.   Accordingly, we find that Graham, as it relates to the sixth *Douglas* factor, fails to demonstrate that the VA discriminated against her based upon her disability.

### iii. Eighth *Douglas* factor.

Graham argues that factor eight, the notoriety of offense or the impact upon the reputation of the agency, was wrongly decided against her. *Doc. 42* at 10. Specifically, Graham takes issue with Callahan's reaction to the online article about the incident, and she argues that the story did not reflect poorly upon the VA. *Id.* Graham contends that the real reason is that Callahan was horrified that "there may be an [*sic*] PLHIV working at the facility he directs, and his behavior is to insure [*sic*] that this situation is eliminated to the best of his ability." *Id.* at 11.

The Secretary counters Graham's argument by noting that she fails to point to any facts or evidence that support her assertion that Callahan was merely horrified that an HIV positive person worked at the facility he directs. *Doc. 43* at 17 (citing

*Jones*, 198 F.3d at 412-14).   We agree with the Secretary that Graham fails to provide any evidence that Callahan's analysis of the eighth *Douglas* factor was based on a personal disdain for HIV positive individuals.   Instead, it is logical that a news article, which described the criminal charges, could be viewed as a poor reflection on the VA.   Accordingly, we find that Graham, as it relates to the eighth *Douglas* factor, fails to demonstrate that the VA discriminated against her based upon her disability.

### iv. Ninth *Douglas* factor.

Graham argues that factor nine, the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question, demonstrates Callahan's moral objection to her HIV status. *Doc. 42* at 7-8.   Specifically, Graham notes that no law in Pennsylvania criminalizes unprotected sexual intercourse or non-disclosure of HIV status and that Callahan's use of the term "wrong" indicates that he had a moral objection to Graham's HIV status instead of any of her potential criminal conduct. *Id*.   The Secretary argues that Graham does not cite to any facts that support her assertion that Callahan used the word "wrong" because of her HIV status. *Doc. 43* at 18. Additionally, the Secretary contends that it is not this court's role to second guess Callahan's decision regarding the *Douglas* factors. *Id*. at 18-19 (citing *Fuentes*, 32

F.3d at 765).

We agree with the Secretary that Graham fails to provide evidence of her assertion that Callahan's use of the term "wrong" indicates that Callahan morally objected to Graham's HIV status.   Indeed, Graham proffers nothing but her baseless interpretation of Callahan's ordinary language and description of the incident, which is insufficient to defeat summary judgment. *See Id*. at 764 (citing *Chauhan v. M. Alfieri Co*., 897 F.2d 123, 128 (3d Cir. 1990) (holding that the plaintiff cannot avoid summary judgment "simply by arguing that the factfinder need not believe the defendant's proffered legitimate explanations[.]")).   Accordingly, we find that Graham, as it relates to the ninth *Douglas* factor, fails to demonstrate that the VA discriminated against her based upon her disability.

### v. Tenth *Douglas* factor.

Graham argues that factor ten, the potential for employee's rehabilitation, was wrongly decided by Callahan and that the proffered reason for the suspension was pretextual. *Doc. 42* at 9-10.   Specifically, Graham contends that Callahan had no evidence to support his statement that Graham failed to acknowledge and accept personal responsibility or express regret for her action. *Id*. at 9.   Graham then notes that she participated in the ARD program and that "the only clear conclusion that can

38

be drawn from her conduct after the filing of the criminal charges that she did not believe her conduct could be identified as criminal, and that she was going to use every means at her disposal to defend and defeat the criminal charges." *Id*. Additionally, Graham states that she "had done nothing which required regrets on her behalf." *Id*.   Finally, Graham argues that Callahan's suggestion that Graham's action damaged the employer-employee relationship is disingenuous and that she would not have restored her to her former position if this was the case. *Id*. at 9-10.

The Secretary counters Graham's arguments by noting that she fails to point to any evidence "that Callahan's response about her potential for rehabilitation was motivated by her disability." *Doc. 43* at 19.   Additionally, the Secretary notes Graham's statement that she had done nothing wrong that required regret on her behalf as evidence that Callahan's decision was not so clearly wrong as to believe he thought Graham should show remorse because she was disabled. *Id*.

We agree with the Secretary that Graham fails to point to any evidence that Callahan's decision, as it relates to factor ten, was based on discriminatory animus toward her disability.   Graham argues that Callahan had no evidence to conclude that she had not shown remorse for her actions but then, curiously, asserts that she "had done nothing which required regrets on her behalf." *Doc. 42* at 9.   We find that this contradiction, if anything, supports Callahan's decision.   Thus, because Callahan's

39

decision appears logical, and Graham provides no evidence of discriminatory

evidence on the part of Callahan, we find that Graham, as it relates to the tenth

*Douglas* factor, fails to demonstrate that the VA discriminated against her based upon

her disability.

**VI.    Conclusion.**

      Based on the foregoing, we will grant the Secretary's motion for summary

judgment, and the case will be closed.   An appropriate order will issue.

                             ***<u>S/Susan E. Schwab</u>***
                             Susan E. Schwab
                             United States Magistrate Judge